UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

RAYONIER WOOD PRODUCTS, L.L.C.,

Plaintiff/Appellee,

v. 609CV028

SCANWARE, INC. and FINSCAN OY,

Defendants/Appellant.

## ORDER

### I. INTRODUCTION

This lawsuit arises from the sale of a lumber grading system to plaintiff/appellee Rayonier Wood Products ("Rayonier") by debtor/defendant ScanWare, Inc. Rayonier sought damages for breach of contract against both ScanWare and defendant/appellant FinScan OY (ScanWare's owner) in Emanuel County Superior Court. ScanWare subsequently petitioned for Chapter 11 reorganization in the District of Oregon (the "Oregon bankruptcy court"). FinScan then removed the state court action to the bankruptcy court for the Southern District of Georgia (the "Georgia bankruptcy court"), and Rayonier moved that court to remand and/or abstain. The Georgia bankruptcy court granted Rayonier's motion and remanded the action to Emanuel County Superior Court. FinScan now appeals that decision to this Court.

### II. BACKGROUND

In May 2006, Rayonier and ScanWare entered into a contract (the "Contract") under which ScanWare was to provide Rayonier, at its wood products facility in Emanuel County, Georgia, a planer mill trimmer optimization system. Doc. # 1-14 at 2. This system was intended to perform better than ninety five percent on grade performance pursuant to industry standards. *Id.* The Contract contained a choice of law provision,[1] requiring any dispute arising under and in connection with the Contract be litigated before the courts of Emanuel County, Georgia. *Id.* at 2-3. FinScan, a Finnish company and then minority owner of ScanWare,[2] was not a signatory to the Contract. *Id.* at 3.

On 7/17/08, Rayonier filed a complaint in Emanuel County Superior Court against ScanWare and FinScan. *Id.* The Complaint alleged, *inter alia*, that Defendants breached the Contract when the lumber grading system failed to perform to industry standards. *Id.* at 3-4. On 10/29/09, ScanWare petitioned for Chapter 11 reorganization in the Oregon bankruptcy court,[3] and FinScan filed a Notice of Removal in the Georgia bankruptcy court. *Id.* at 4-5; *see* 28 U.S.C. § 1452(a) ("A party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under [28 U.S.C. § 1334]."). On 11/21/08, Rayonier, citing the Contract's choice of law provision, filed a motion to remand the litigation to state court

---

[1] The relevant text of the Contract's choice of law provision states: "All disputes ... arising under, in connection with, or incidental to [the Contract] shall be litigated ... before the courts of the county and state in which the goods or services were ultimately delivered or performed, as applicable, to the exclusion of other courts of other states, the United States, or countries and in the exclusion of other venues. The parties express consent to the exclusive jurisdiction of this court and agree that this venue is convenient and not to seek a change of venue or to dismiss the action on the grounds of *forum non conveniens* and not to remove any litigation from the court to a federal court." Doc. # 1-4 at 47.

[2] FinScan did not acquire 100% ownership of ScanWare until October 2007. Doc. # 1-9 at 7.

[3] The Oregon bankruptcy court has since converted ScanWare's Chapter 11 case to a case under Chapter 7. Doc. # 4-2 at 2-3.

and/or abstain from hearing the case. *Id.* at 5; *see* 28 U.S.C. §§ 1334(c)(1) ("[A] district court in the interest of justice, or in the interest of comity with State courts or respect for State law, [may abstain] from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."), 1452(b) (providing court with discretion to remand on any equitable ground). On 12/19/08, ScanWare filed a motion to transfer venue of the removed action to the Oregon bankruptcy court. *Id.*; *see* 28 U.S.C. § 1412 (providing district court with discretion to transfer title 11 proceeding to a more convenient venue); F.R.Bank.P. 7087 ("On motion and after a hearing, the court may transfer an adversary proceeding or any part thereof to another district pursuant to 28 U.S.C. § 1412...."). The Georgia bankruptcy court never reached the merits of the venue transfer question and instead granted Rayonier's motion to remand and/or abstain. Doc. # 1-14 at 16-17. FinScan's appeal of that decision is presently before the Court. Doc. # 1-15. FinScan contends that the Georgia bankruptcy court erred by (1) declining to transfer venue and (2) abstaining and remanding the suit to Emanuel County Superior Court. The Court will address these two issues in turn. Doc. # 3 at 5.

## III.  STANDARD OF REVIEW

Decisions to abstain under 28 U.S.C. § 1334(c)(1) are reviewed under an abuse of discretion standard. *Fl. Dept. of Fin. Servs. v. Poe Fin. Group, Inc.*, 2008 WL 2704386, *2 (M.D. Fla. 2008) (unpublished). "A court abuses its discretion if it applies the wrong legal standard, uses improper procedures to reach its result, or makes factual findings that are clearly erroneous." *Id.* (citing *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1251 (11th Cir. 2006)). The Court reviews a bankruptcy court's conclusions of law *de novo*. *See In re Thomas*, 883 F.2d 991, 994 (11th Cir. 1989).

## IV.  TRANSFER OF VENUE

FinScan contends that the Georgia bankruptcy court should have transferred venue to the Oregon bankruptcy court before considering the merits of abstention and/or remand, noting that the Oregon bankruptcy court oversees ScanWare's bankruptcy proceeding and will resolve the claims of similarly situated creditors who, like Rayonier, purchased equipment from ScanWare. Doc. # 3 at 9. FinScan thus urges this Court to follow a line of cases that hold that the home bankruptcy court (*i.e.*, the bankruptcy court where the debtor filed his petition) is best situated to make the abstain/remand decision. *See id.* at 9-10 (referencing *Everett v. Friedman's Inc.*, 329 B.R. 40 (S.D. Miss. 2005); *Tallo v. Gianopoulos*, 321 B.R. 23 (E.D.N.Y. 2005); *In re Aztech Indus., Inc.*, 84 B.R. 464 (N.D. Ohio 1987)).

In its Memorandum and Order, however, the Georgia bankruptcy court expressly recognized that courts are divided on the proper sequence for ruling on competing motions to transfer venue or remand. Doc. # 1-14 at 10. Some jurisdictions, as FinScan now reminds the Court, hold that the home bankruptcy court should determine the issues underlying motions to abstain or remand. *Id.* The theory underlying this argument is often referred to as the "conduit" court theory because it treats the local bankruptcy court (the bankruptcy court to which the state action is removed – here, the Georgia bankruptcy court) as a mere conduit with little role in determining where the removed lawsuit should be heard. *Id.* Other jurisdictions, by contrast, hold that the local bankruptcy court should rule on pending motions to abstain/remand. *Id.* at 11.

The Georgia bankruptcy court, to FinScan's chagrin, adopted the latter holding because of its "strong statutory and logical support." *Id.* at 12. The court noted that the

discretionary language of 28 U.S.C. §§ 1412 (change of venue) & 1452 (removal of bankruptcy claims) suggests that the local bankruptcy court, does not act merely as a conduit, but actually plays a more active role in the abstain/remand question. *See* 28 U.S.C. §§ 1412 ("A district court *may* transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.") (emphasis added), 1452(b) ("The court to which such claim or cause of action is removed *may* remand such claim or cause of action on any equitable ground.") (emphasis added).

The Court agrees and sees no reason to disturb the well-founded decision of the Georgia bankruptcy court on this issue. The court was not bound to follow the line of cases advocated by FinScan, and the court indeed selected the approach that best comports with the text of the relevant statutes. Because the Georgia bankruptcy court was correct in deciding the abstain/remand question before reaching the merits of venue transfer, this Court will now consider whether the Georgia bankruptcy court erred by remanding this case to Emanuel County Superior Court.

## V. ABSTENTION/REMAND

As noted by the Georgia bankruptcy court and mutually agreed upon by the parties, discretionary abstention and equitable remand are "kindred statutes," as both favor "comity and the resolution of state law questions by state courts." *Id.* at 14. When deciding upon the question of abstention or remand, courts will often employ a similar multi-factor test, considering: (1) the effect of abstention on the efficient administration of the bankruptcy estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the basis of bankruptcy jurisdiction, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the bankruptcy court's docket; (10) the likelihood that commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; (2) the presence in the proceeding of non-debtor parties; (13) comity; and (14) the possibility of prejudice to other parties in the action. *Id.* at 15 (citing *In re United Container LLC,* 284 B.R. 162, 176-77 (Bankr. S.D. Fla. 2002) (citations omitted)). FinScan argues that the Georgia bankruptcy court misapplied the above test, and that the relevant factors instead "tip decidedly in favor of retaining this case in bankruptcy court." Doc. # 3 at 10.

### A. Comity and Choice of Law Provision

FinScan devotes much of its opening brief to challenging the Georgia bankruptcy court's focus on comity and respect for state jurisdiction, which the court reasoned were "compelling considerations in this case." Doc. # 1-14 at 16. FinScan suggests that comity is not a concern in this case because the Contract's choice of law provision favoring the state court system in Emanuel County is unenforceable to begin with. Doc. # 3 at 11-17.

### 1. Enforcement of Choice of Law Provision and Public Policy

FinScan first argues that a choice of law provision should not be enforced when doing so violates a strong public policy. Doc. # 3 at 11. It contends that enforcement of the Contract's choice of law provision -- limiting venue to Emanuel County Superior Court -- would violate the policy in favor of centralizing claims against a debtor (here,

3

ScanWare) in the bankruptcy courts. The Court disagrees.

The public policy FinScan alludes to is normally protected by other provisions of the bankruptcy code, namely the automatic stay provision of 11 U.S.C. § 362. Under that provision, a bankruptcy petition operates as a stay of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title...." 11 U.S.C. § 362(a)(1). Rayonier's claim against ScanWare was commenced before ScanWare petitioned the Oregon bankruptcy court for Chapter 11 relief, so proceedings in the Emanuel County Superior Court were stayed as soon as ScanWare sought bankruptcy protection. Because Rayonier's suit against ScanWare will not proceed upon remand to the state court,[4] the policy of centralizing claims in bankruptcy courts is never really a concern. Naturally then, enforcement of the Contract's choice of law provision does nothing to violate that policy.[5][6]

---

[4] The stay of an act under § 362(a) continues until "the time the [bankruptcy] case is closed" or "the time the case is dismissed," whichever is earlier. 11 U.S.C. § 362(c)(2).

[5] Although it may seem odd that the Court is willing to remand this case to a court where the proceedings are stayed, the Court will later recommend in this Order that the automatic stay be lifted as it applies to non-debtor FinScan. *See infra* Section VI.

[6] Non-enforcement of the Contract's choice of law provision would defeat the separate and competing policy in favor of enforcing contractual obligations. *See Daniel v. Daniel*, 250 Ga. 849, 851 (1983) (observing "a strong public policy in favor of enforcing contracts as written and agreed upon").

### 2. ScanWare as Alter Ego of FinScan

FinScan next argues that even if the Contract's choice of law provision is not violative of public policy, FinScan was not a signatory to the Contract and therefore cannot be bound by its terms. Doc. # 3 at 12. The Georgia bankruptcy court decided otherwise, reasoning that FinScan was "closely related" to ScanWare, making it "foreseeable [that] it would be bound" by the Contract's terms. Doc. # 1-14 at 16.

FinScan begins with a somewhat halfhearted argument that the Georgia bankruptcy court erred because it never concluded that FinScan and ScanWare were instrumentalities or alter egos of one another, doc. # 3 at 12, a precondition to bind a non-party to contractual terms. Even though the Georgia bankruptcy court's analysis of the issue is markedly thin, it should be obvious to any reader of the Memorandum and Order that the court indeed concluded that ScanWare was an instrumentality/alter ego of FinScan, even if the court did not use those exact words.[7]

The more intriguing issue here is whether the Georgia bankruptcy court erred by concluding that ScanWare was in fact an instrumentality or alter ego of FinScan, and thus bound to the Contract's choice of law provision. The Eleventh Circuit, drawing from decisions by the Third and Seventh Circuits, has summarized the relevant law on this issue:

> "In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) .... In

---

[7] The flaw in FinScan's argument here becomes even more evident later in its opening brief, when it points out that "Judge Davis noted that ScanWare and FinScan use the same slogan as evidence of an *alter ego relationship*." Doc. # 3 at 16 (emphasis added).

4

*Hugel,* which involved a suit brought by a Name against Lloyd's, the Seventh Circuit affirmed the district court's finding that two non-signatory corporations were bound by the Name's assent to the Lloyd's choice clauses. *See* 999 F.2d at 209-10. The district court based its finding upon the fact that the Name owned 99% of one corporation, which owned 100% of the other. *See id.* The court of appeals noted that "[w]hile it may be true that third-party beneficiaries to a contract would, by definition, satisfy the 'closely related' and 'foreseeability' requirements, a third-party beneficiary status is not required." *Id.* at 209-10 n.7; *cf. Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1297 (3d Cir. 1996) (holding that a sister corporation that did not sign an arbitration agreement could not be bound by the agreement, but noting that if the "corporation's interests were directly related to, if not predicated upon, the [signatory's] conduct," the corporation would have been subject to agreement).

*Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir. 1998).

Georgia law does not precisely mirror the "closely related" language used by the Eleventh Circuit in *Lipcon,* but the underlying premise remains the same. In Georgia, as is true in every state, "[a] corporation is a separate legal entity, and great caution should be exercised before disregarding this separateness." *Garrett v. Women's Health Care of Gwinnett,* 243 Ga. App. 53, 55-56 (2000). "Georgia courts will pierce the corporate veil 'to remedy injustices which arise where a party has overextended [her] privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or *to evade contractual or tort responsibility.*'" *Id.* at 56 (quoting *J-Mart Jewelry Outlets v. Standard Design,* 218 Ga. App. 459, 460 (1995) (emphasis added)).

Before proceeding, the Court pauses to recognize that FinScan and ScanWare are indeed separate legal entities. The Court, therefore, continues with an abundance of caution, understanding that a decision to bind FinScan to the Contract's choice of law provision effectively pierces the corporate veil dividing ScanWare from its owner, FinScan. FinScan has maintained throughout this litigation that it is a legal entity separate and distinct from ScanWare. Whether Defendants were so "closely related" that it became foreseeable that FinScan would be bound by the Contract's terms is a question that can only be answered by an assessment of all relevant facts in this case. In doing so, the Court is reminded of the old adage: "Where there is smoke, there is fire," and FinScan's continued and considerable involvement in ScanWare's business has created plenty of smoke here.

FinScan asserts that its minority interest in ScanWare (at the time the Contract was signed) is irrelevant since it lacked "the power to control or bind ScanWare." Doc. # 3 at 15-16. This assertion is incorrect. Although the facts here are not as straightforward as they were in *Hugel,* where the non-signatory corporations were bound by the forum selection clause by virtue of the signatory's near-total ownership of the companies, FinScan's minority ownership is nonetheless relevant -- *albeit* non-dispositive -- evidence of the two parties' close relatedness.

There is, on the other hand, abundant evidence indicating that FinScan has been continuously and pervasively involved with ScanWare's business, which weighs heavily in favor of the finding that ScanWare was an instrumentality or alter ego of FinScan during the time in question. For instance, Rayonier directly communicated with FinScan

5

employees from the very beginning of the relevant business deal, doc. # 1-4 at 57-59 (email exchange between Rayonier and FinScan employees), and it was FinScan's president (who has also served as ScanWare's president following its acquisition) who attempted to smooth things over with Rayonier when the lumber grading system did not perform as warranted. *Id.* at 60, 63-65 (email exchange between FinScan's president and Rayonier employees).

A third relevant consideration is whether the systems sold by ScanWare were, in fact, nothing more than FinScan machines. *See* doc. ## 3 at 16; 5 at 11. The parties agree that ScanWare produced equipment (such as the lumber grading system sold to Rayonier) incorporated several components manufactured by FinScan. Doc. # 3 at 16. FinScan argues that this undisputed fact should not be used as evidence of an alter ego relationship because doing so would yield "remarkable" results. *See id.* ("General Motors would suddenly be deemed the alter ego of each and every supplier of parts which are incorporated into one of its cars."). True as this may be, there are other substantial circumstances at play here. The user manual for the lumber grading system -- a copy of which was provided to Rayonier -- displayed FinScan's logo and slogan, identified the machine as a FinScan system, and even presented a narrative describing FinScan Oy's company history. Doc. # 1-4 at 67. The footer of every page in the user manual displayed FinScan's address in Epsoo, Finland and its telephone and fax numbers. *Id.* The installation and service manual, moreover, displayed similar contact information in the footer of its pages. *Id.* at 75. Thus, continuing with FinScan's "remarkable" hypothetical, had General Motors incorporated a Toyota engine in one of its trucks, identified the truck as a Toyota vehicle, and prominently displayed Toyota trademarks and contact information on all of its documentation, suddenly the proposition that General Motors is an alter ego of Toyota would not seem so far-fetched. Perhaps FinScan did not actually intend to be identified with the product this way and is simply a victim of its own mismanagement of the use of its intellectual property, but, based on all of the foregoing facts, it is reasonable to conclude that ScanWare was selling FinScan machines.

The Court therefore concludes that ScanWare was an instrumentality or alter ego of FinScan when the Contract was signed. Although it was not a signatory to the Contract, FinScan is bound by the terms of the Contract, including the choice of law provision limiting venue to the Emanuel County Superior Court.

**B. Other Factors Favoring Remand**

Comity and respect for state jurisdiction are undoubtedly the more compelling reasons to remand this case back to state court. That is why the parties devoted much of their briefs to that issue and why the Court allots considerable weight to this, the thirteenth factor of the multi-factor test described in *United Container*. 284 B.R. at 176-77. Most of the other relevant factors, however, also support the Georgia bankruptcy court's decision to remand this case to state court.

Abstention would have no effect on the administration of the bankruptcy estate (factor 1), as Rayonier will be stayed from proceeding against ScanWare upon remand. State law issues will likely predominate over bankruptcy issues (factor 2) since Rayonier seeks damages for breach of contract and has all but abandoned its efforts to recover from ScanWare (the debtor). There is, of course, a proceeding that has been commenced against FinScan in state court (factor 4). There is no basis for bankruptcy jurisdiction, other than 28 U.S.C. § 1334, as the parties agreed to litigate in the Emanuel County Superior Court (factor 5). *See supra* section V.A. It will be feasible to sever state law claims from bankruptcy

matters (assuming ScanWare successfully petitions for relief from the automatic stay), permitting a judgment to be entered in state court with enforcement left to the bankruptcy court (factor 8). There remains a lingering suspicion that FinScan removed the case to the Georgia bankruptcy court to avoid litigating in Emanuel County (factor 10). A jury trial can be more easily obtained if the case is remanded to state court (factor 11). Finally, there is the presence of a non-debtor party (FinScan) in this proceeding (Factor 12). Because most of the relevant factors in this case favor remand to state court, the Georgia bankruptcy court did not abuse its discretion in abstaining and remanding this case to Emanuel County Superior Court.

VI. **EFFECT OF REMAND**

As noted earlier, the Georgia bankruptcy court's decision to remand has minimal (if any) effect on the administration of ScanWare's bankruptcy estate by reason of the automatic stay. *See supra* sections V.A.1, V.B. Rayonier will be unable to proceed against ScanWare unless it successfully petitions the Oregon bankruptcy court for relief from the automatic stay. The Court, however, suspects that Rayonier will have little desire to do so since ScanWare's unsecured creditors seek more than $5.2 million from ScanWare's $1 million bankruptcy estate. *See* doc. ## 1-14 at 6; 3 at 7-8. Rayonier would obviously prefer to recover from non-bankrupt FinScan in state court. Until 2005, Rayonier may have been able to do so.[8] Since then, however, the Georgia Supreme Court has determined that, where an automatic stay against actions by creditors is in place, a debtor corporation (ScanWare) has the exclusive right to bring an alter ego claim against its owner (FinScan). *See Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 292 (2005) (answering certified question from *Icarus Holding*, 391 F.3d 1315). The alter ego claim is deemed property of the estate, and, as a result, "all creditors are prevented by the automatic stay from prosecuting individual alter ego claims, thus affording equal treatment to all." *Id.* at 291 (citing *In the Matter of S.I. Acquisition*, 817 F.2d 1142, 1153 (5th Cir. 1987)). Rayonier, therefore, will be unable to proceed against FinScan upon remand because the automatic stay created by ScanWare's bankruptcy applies to claims not just against ScanWare, but also against its alter ego. This, however, in no way relieves FinScan from liability if it indeed breached the Contract. *See id.* at 301 ("[I]t is readily apparent that where the corporate entity is disregarded, a principal found liable under an alter ego theory should be liable for the entirety of the corporation's debt."). Rather, any recovery from an owner under an alter ego theory is added to the debtor's bankruptcy estate, which will ultimately be distributed equitably among the creditors.

Here, Rayonier can still proceed directly against FinScan if the Oregon bankruptcy court agrees to lift the automatic stay. If Rayonier is able to recover from FinScan in the Emanuel County Superior Court, the amount recovered will be added to ScanWare's bankruptcy estate. The Oregon bankruptcy court will then distribute the recovered amount along with the rest of the

---

[8] *See In re Icarus Holding, LLC*, 391 F.3d 1315, 1322 (11th Cir. 2004) ("The only courts in Georgia to address this issue directly are the federal bankruptcy courts, but they are divided on whether Georgia law allows a corporation to bring this type of alter ego action. *Compare* [*In re Adam Furniture Indus., Inc.*, 191 B.R. 249, 255 (Bankr. S.D. Ga. 1996)] (considering the corporation's alter ego claim as property of the estate under Georgia law), *and* [*In re City Comm'ns, Ltd.*, 105 B.R. 1018, 1022 (Bankr. N.D. Ga. 1989)] (interpreting Georgia law to allow corporations to bring alter ego claims), *with In re Mattress N More, Inc.*, 231 B.R. 104, 109 (Bankr. N.D. Ga. 1998) (holding that Georgia law does not allow a corporation to bring alter ego actions).")

7

bankruptcy estate. The Court, therefore, recommends that the automatic stay in this case be lifted or modified as it applies to non-debtor FinScan. Lifting the automatic stay as described will have relatively little (if any) interference with ScanWare's pending bankruptcy case. *See* S. Rep. No. 989, at 52, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838. ("The lack of adequate protection of an interest in property is one cause for relief, but is not the only cause. Other causes might include *the lack of any connection with or interference with the pending bankruptcy case.*") (emphasis added). FinScan, moreover, as ScanWare's alter ego, agreed to litigate all disputes arising from the Contract in Emanuel County Superior Court. *See supra* section V.A.2.

The Court, however, recognizes that any decision regarding relief from the automatic stay must originate from the District of Oregon. The Court, therefore, respectfully defers to the Oregon bankruptcy court on this issue.

## VII. <u>CONCLUSION</u>

The Georgia bankruptcy court correctly decided that the abstention/remand question should be addressed before the merits of venue transfer are considered. Moreover, the bankruptcy court did not abuse its discretion in remanding this case to state court. The Memorandum and Order of the bankruptcy court is thus *AFFIRMED*. Doc. # 1-14. This case is therefore *REMANDED* to the Superior Court of Emanuel County.

This day of 30 November 2009

/s/ B. Avant Edenfield

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA